---

## SNYDER v. FOSTER.

(Circuit Court of Appeals, Fifth Circuit. February 24, 1896.)

### No. 416.

NATIONAL BANKS—LIABILITY OF STOCKHOLDERS—TRANSFER OF SHARES.

One S. subscribed for 50 shares of the stock of a national bank, borrowing the money to pay for them from C., the cashier of the bank. As collateral security for the money so borrowed, he indorsed over the certificate to C., and left it with him. A few months later he sold the stock to C. for the amount of the loan and accrued interest, the certificate remaining in C.'s hands. The bank was solvent at the time, and so continued for five years, during which C. collected the dividends on the stock, as shown by the bank's dividend book, but the stock was never actually transferred to C. on the books of the bank. The by-laws of the bank provided that dividends should be paid to the stockholders in whose names the stock should stand; that certificates should be issued by the president and cashier; and that, when stock was transferred, the certificate should be canceled, and a new one issued. Long after the sale of S.'s stock to C., the bank became insolvent, an assessment was made upon the stockholders, and the receiver of the bank, finding S.'s name as a stockholder on the books of the bank, brought suit against him. On the trial of the suit the foregoing facts were shown. C. was dead at the time of the trial. *Held*, that it might be inferred as a fact, from the evidence, that the bank had notice of the transfer of the stock by S. to C., and the termination of S.'s relation to the bank as stockholder, from which fact the legal presumption would follow that the bank would cause such acts to be done in relation to the transfer as its officers were called on to do, and that the jury should be permitted to draw such inference.

In Error to the District Court of the United States for the Western District of Texas.

Robert G. West, for plaintiff in error.

Benj. F. Fowler, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and BOARMAN, District Judge.

BOARMAN, District Judge. Joel W. Foster, receiver of the Cheyenne National Bank of Wyoming, brought suit in the district

court for the Western district of Texas against J. W. Snyder, to recover $5,000, with interest thereon. Said sums were alleged to be due said bank by defendant as the holder of 50 shares of stock in said insolvent bank by virtue of the law and an order made there under by the United States comptroller of the currency, levying an assessment of $100 per share upon the shareholders of the said bank as provided by sections 5139 and 5151 of the Revised Statutes of the United States, which said sections are as follows:

Rev. St. U. S. § 5139: "The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and transferable, on the books of the association, in such manner as may be prescribed in the by-laws, or articles of the association. Every person becoming a shareholder, by such transfer, shall in proportion to his shares succeed to all the rights and liabilities of the prior holder of such shares, and no change shall be made in the articles of association by which the rights, remedies or security of the existing creditors of the association shall be impaired."

Rev. St. U. S. § 5151: "The shareholders of every national banking association shall be held individually responsible equally and ratably, and not for another, for all contracts, debts and engagements of such association to the extent of the amount of their stock therein at the par value thereof in addition to the amount invested therein. * * *" (Remainder of the article omitted as it has no bearing on the questions raised by the assignments.)

In addition to said sections of law we quote the following sections of the said bank's by-laws:

"Sec. 17. The stock of the bank shall be assignable and transferable only on the books of the bank, subject to the restrictions and provisions of the banking laws, and a transfer book shall be provided, in which all assignments and transfers of stock shall be made.

"Sec. 18. The transfer of stock shall not be suspended preparatory to the declaration of dividends, and, unless an agreement to the contrary shall be expressed in the assignment, dividends shall be paid equally to the stockholders in whose name the stock shall stand at the date of the declaration of dividends.

"Sec. 19. Certificates of stock assigned by the president and cashier may be issued to a shareholder, and the certificate shall state upon the face thereof that the stock is transferable only upon the books of the bank, in person, or by attorney; and when the stock is transferred the certificate thereof shall be returned to the bank, and canceled, and new certificate issued."

The evidence shows the order of the United States comptroller directing the said assessment, etc., on the shares of all stockholders of the bank; that Snyder's name appears in the bank's book showing the names of the stockholders. Aside from the bank's books, and the sections of the laws, etc., quoted supra, the only oral testimony offered was by Snyder for himself, it being admitted that the cashier, Collins, and the president of the bank, are dead. Plaintiff in error's testimony shows substantially as follows: That Snyder, in order to obtain money to pay for the 50 shares subscribed to the bank, borrowed $5,000 on November 19, 1885, from Collins, then the cashier of the said bank; that Snyder sold his said share of stock to Collins individually, on July 6, 1886, for $5,378.33; that he had collected no dividends thereon; that at the time Snyder became the owner of said shares he indorsed the certificate over to Collins, and left it with him as collateral security for the $5,000 which he borrowed from Collins; that when Snyder sold his shares of stock to Collins he and Collins were both in the bank's office, and Collins at the time was the cashier as well as a director of the bank; that Snyder's

stock certificate, having been indorsed over to Collins when he borrowed said money from him, remained and was in his hands at the time of Snyder's sale of said stock to Collins; that Snyder moved away from Cheyenne into Texas some time in 1886; that the dividend book No. 1 of the bank shows that Collins, after his said purchase from Snyder, collected two or more dividends for himself on the said 50 shares of stock; that Snyder's said stock certificate is lost; that the bank was solvent at the time of the sale by Snyder to Collins, and remained so five years thereafter; that Snyder never knew that the stock had not been transferred to the bank's books until some time in 1895, when the said assessment now sued on was made against him. It was admitted that the Cheyenne National Bank was a banking corporation under the laws of the United States, and doing business in Cheyenne, state of Wyoming, and the defendant, J. W. Snyder, was a citizen of Texas, at the time this suit was filed. Joel Ware Foster, the plaintiff in this case, was regularly appointed on December 5, 1895, by the comptroller of the currency as receiver of the National Bank of Cheyenne, Wyo., and duly qualified as such. In a book styled "Stock Ledger of the Cheyenne National Bank" the name of John W. Snyder is to be found on page 105, and he is credited with having, on November 19, 1885, 50 shares of the capital stock transferred to him by John W. Collins, the certificate being No. 20.

On this trial, all the evidence having been submitted to the jury, the court directed a verdict for the plaintiff. In aid of his bills of exception, the plaintiff in error has attached thereto all of said evidence. The assignments of error—such of them as we have not included in our ruling herein adversely—are as to the refusal of the court to give certain instructions to the jury. Such refused requests for charges are set out in the following assignments:

Eighth assignment of error: "Said district court erred in not giving the following special charge asked by this plaintiff in error: 'That because the defendant's name may appear as a stockholder in the bank on the stock book, or transfer book of stock, does not make him absolutely liable in this case, because there are circumstances which, if existing, and you believe from the evidence that they do exist, would excuse him from liability. So I charge you that if you believe from all the evidence before you that J. W. Snyder, the defendant, owned the stock in controversy, and before the failure of the bank, in good faith, honestly, and for value, did sell to J. W. Collins said stock, and did, in connection therewith, execute to said J. W. Collins an assignment of said stock in words as set forth on the back of the certificates of stock in use by said bank, a copy of which has been read in evidence before you, and that he, in connection with said assignment, did what he could, and what a reasonably cautious and prudent business man would, do, or would have done, under all the circumstances of the case in evidence, to have said sale (if made) entered on the book of transfer, to relieve himself from all future liability, because of the once ownership of said stock, then defendant would not be liable in this case, and you will find a verdict for defendant.' "

Ninth assignment of error: "Said district court erred in not giving the following charge, asked by plaintiff in error: 'If the jury believe from all the facts and circumstances in evidence that defendant, J. W. Snyder, was the owner of certificate of stock No. 20 for 50 shares of stock for $100 each in the Cheyenne National Bank, and that on the 6th day of July, 1886, he, in good faith, bona fide, for value, sold said stock to W. J. Collins, and that he, defendant Snyder, did all that a reasonably prudent man would do or would have done, under all the facts and circumstances before you, to have said sale re-

corded or carried into the stock transfer book, then he would not be and is not liable in this case, and you will find a verdict for defendant.' "

Tenth assignment of error: "Said district court erred in refusing to give the following instructions, asked by the plaintiff in error: 'If the jury believe from all the evidence in this case that the defendant, J. W. Snyder, did all that a reasonably cautious and prudent man would do to have the transfer or certificate of stock No. 20 in the Cheyenne National Bank from him to J. W. Collins (if he made a sale thereof) to have the transfer thereof noted and perpetuated on the book of stock transfer, then you will find a verdict for defendant.' "

The defendant in error contends that the facts shown in the record bring the case under the rule laid down in Richmond v. Irons, 121 U. S. 27, 7 Sup. Ct. 788, from which we quote as follows:

"As to the 50 shares of stock sold by Comstock to Holmes, September 23, 1873, we think the conclusion cannot be resisted that the transaction was made in contemplation of the insolvency of the bank, and, although both parties may have believed that the bank would ultimately be able to pay all of its debts notwithstanding this transaction, we think that, as against creditors, it was fraudulent in law, and to that extent Comstock is chargeable as a shareholder. The sale of 50 shares in February, 1873, and of the other 50 shares in June, 1873, there is no reason to suppose were not made in entire good faith, and without any expectation on the part of the parties of the insolvency of the bank. Notwithstanding that, Comstock continued to be, upon the books of the bank, the owner of these shares until September 23d and September 24th, when they were respectively transferred. By section 5139 of the Revised Statutes those persons only have the rights and liabilities of stockholders who appear to be such as are registered on the books of the association, the stock being transferable only in that way. No person becomes a shareholder, subject to such liabilities, and succeeding to such rights, except by such transfer. Until such transfer, the prior holder is the stockholder for all purposes of the law. It follows, therefore, that Charles Comstock, in respect to the shares sold by him in February and June, 1873, was the statutory owner on the 23d day of September, 1873. His liability as such stockholder is the same as if he had that day sold and transferred the stock to Ira Holmes; but such a sale and transfer could only have been made that day by Comstock, who was himself a director, in contemplation and actual knowledge of the suspension of the bank. It would operate as a fraud on the creditors,—an effect which the law will not permit. The case is not within the rule laid down in Whitney v. Butler, 118 U. S. 655, 7 Sup. Ct. 61. Here there is no proof, as there was in that case, of the delivery of the certificates to the bank, and the power of attorney authorizing its transfer, with a request to do so, made at the time of the transaction. The delivery was to Holmes, not as president, but as vendee. We are therefore constrained to hold that the decree below, in charging Comstock with liability as the owner of 150 shares, was not erroneous."

The plaintiff in error urges us to apply the rule of law announced in Whitney v. Butler, 118 U. S. 655, 7 Sup. Ct. 61:

"But it will be found, upon careful examination, that in no one of the cases upon which these general principles have been announced, as between creditors and shareholders, does it appear that the precaution was taken, after the sale of the stock, to surrender the certificates therefor to the bank itself, accompanied (where such surrender was not made by the shareholder in person) by a power of attorney, which would enable its officers to make the transfer on the register. The position of the seller in such a case is analogous to that of a grantor of a deed deposited in the proper office to be recorded. The general rule is that the deed is considered as recorded from the time of such deposit. 2 Washb. Real Prop. bk. 3, c. 4, par. 52. Where the seller delivers the stock certificate and power of attorney to the buyer, relying upon the promise of the latter to have the necessary transfer made, or where the certificate and power of attorney are delivered to the bank without communicating to its officers the name of the buyer, the seller may well be held liable as a shareholder until, at least, he shall have done all that he reasonably can do to effect a trans-

fer on the stock register. In the case before us, the personal presence of the defendants at the bank was not required, in order to secure their release from liability as shareholders. Besides, the certificates of stock authorized them to act by attorney. Through their agents, the brokers who sold the stock, and through whom they received the money paid for it, they surrendered the certificates and power of attorney to the president of the bank; he receiving them with knowledge not only that defendants had parted with all title to the stock, and had been paid for it, but also that it had been purchased at public auction by Eager. He knew equally well that the surrender of the certificates and the delivery of the power of attorney and the certificate from the probate court ·could only have been for the purpose of having it appear, by means of a transfer on the books of the bank, that Whitney's executors were no longer shareholders. The right to have the transfer made, and thereby secure exemption from further responsibility, was secured to the defendants, both by the statute and by the by-laws of the bank. They did all that was required by either as preliminary to such transfer. Nothing remained to be done except for some officer of the bank to make the necessary formal entries on its books. If, when the agents of defendants delivered the certificates and power of attorney to the president of the bank, the latter had given an intimation of a purpose not to make the transfer promptly, or had avowed an intention to postpone action until a sufficient amount of stock was obtained to fill Coburn's order, it may be that the failure of the defendants to take legal steps to compel a transfer would, in favor of the creditors of the bank, have been deemed a waiver of the right to an immediate transfer on the stock register. But no such intimation was given; no such avowal was made. No objection was made to the power of attorney, or to the discharge of the defendants from liability. So far as the record shows, nothing was said or done by the bank's officers to raise a doubt in the minds of the defendant's agents that the transfer would not be made at once. It was suggested in argument that the defendants should have seen that the transfer was made. But we are not told precisely what ought to have been done to this end that was not done by them and their agents. Had anything occurred that would have justified the defendants in believing, or even in suspecting, that the transfer had not been promptly made on the books of the bank, they would, perhaps, have been wanting in due diligence had they not, by inspection of the bank's stock register, ascertained whether the proper transfer had in fact been made. But there was nothing to justify such a belief or to excite such a suspicion. Their conduct was, under all the circumstances, that of careful, prudent business men, and it would be a harsh interpretation of their acts to hold (in the language of some of the cases, when considering the general question under a different state of facts) that they allowed or permitted the name of Whitney to remain on the stock register as a shareholder. We are of opinion that, within a reasonable construction of that statute, and for all the objects intended to be accomplished by the provision imposing liability upon shareholders for the debts of national banks, the responsibility of the defendants must be held to have ceased upon the surrender of the certificates to the bank, and the delivery to its president of a power of attorney sufficient to effect, as that officer knew, a transfer of the stock on the books of the association to the purchaser."

There seems to be no conflict in the legal principles announced in the two said cases. They are distinguishable only in their facts. It was conceded by counsel in argument that one or the other of these rules should be determinative of the facts in the pending case. We are not advised as to the line of reasoning upon which the learned judge below directed a verdict for the defendant in error, though it appears that he applied the rule of law in Richmond v. Irons, rather than the rule laid down in Whitney v. Butler, to the facts in the pending suit. The fact which shows Snyder's name, with his stock not transferred, on the bank books, appears to have been a sufficient foundation, in the view of the receiver, for bringing suit in this case, as well as it did in the two suits cited; but neither of the

authorities which we have cited, nor any which we have examined, have favored the theory that a defendant stockholder could be subjected to an absolute liability merely because his name, with his stock untransferred, was found by the receiver of an insolvent bank, as appears to have been, in this case, in the bank's stock list. In many cases, if not all of them, the courts have been liberal in hearing evidence dehors the bank's books—as they, under well-established rules of evidence, should be, where liability is sought to be imposed against a defendant by a plaintiff's own books—to show such a condition of things as might in law relieve the sometimes unfortunate defendant whose name may so appear. The transcript shows but little direct evidence in relation to the transaction which took place in the bank's office, in which Snyder sold his stock to Collins. If it was the purpose of the court below to limit the jury's consideration in this case only to the direct evidence relating to said transaction, it may be that the court below, seeing no issues of fact disputed in the direct evidence, thought it unnecessary to submit such evidence to the jury. But were there not deductions therefrom, by way of presumptions of fact, which the jury might have reasonably made from the narrow field of direct evidence relating to that transaction for or against either of the parties to this suit?

First. The direct evidence shows: That Snyder, November 19, 1885, borrowed $5,000 from Collins with which he paid for the 50 shares held by him in said bank. That, having indorsed over his certificate for said shares to Collins, he left the same, so indorsed, with Collins, as security for the loan. That July 6, 1886, in order to pay Collins the said borrowed money, Snyder sold his said shares to Collins for the same sum, with interest added. The evidence shows the said sale was made to Collins, individually, in the bank's office, where Collins was the cashier, and one of the directors; that no fraud is even intimated against Snyder, and all of his relations as a stockholder and director in the bank ceased with said transaction; that his bank book shows an entry of said sum, made therein on the day of the said sale.

Second. The direct evidence shows that while the by-laws provide that the stock of the bank shall be assignable only on the bank's books, etc., they also declare that dividends shall be paid to the stockholders in whose names the stock was standing at the time the dividends were declared; and section 19 of the by-laws makes it the duty of the cashier to issue certificates to the stockholders, which shall be transferable only on the books, etc., and when the stock is transferred the certificate thereof shall be returned to the bank, canceled, and new certificates issued. The evidence shows no fraud on Snyder's part. On the contrary, it shows good faith in him at every step of his in all of his transactions with Collins and the bank. It shows that the bank, in 1886, when Collins bought Snyder's stock, was solvent, and remained so for nearly five years thereafter; that Snyder ceased to be a director when Collins bought his said stock, and all the dividends shown ever to have been declared on Snyder's said shares were collected by Collins, for himself, under the said by-laws; and that Snyder, having moved into Texas, had no knowledge

of the bank, or any of its transactions, for five years or more, after the said sale to Collins. We think from the state of facts which are shown in the direct evidence, supplemented, as it may be, by deductions fairly drawn therefrom, the law will impute notice to the bank, and charge it with such knowledge of such transactions as its executive officer, Cashier Collins, and one of its directors, Collins, possessed, by reason of said sale and transfer of the said shares, made to him as an individual; and that such a state of case will give rise to and be attended by a legal presumption in favor of Snyder that the bank, through its official, would do, or cause to be done, such acts in relation to the transfer of said shares, as its executive officer was required to do in the premises. It was Cashier Collins' duty, in the bank's interest, as well as in his own individual interest, he having become, in good faith, the vendee of the stock, and the certificate therefor having been left with him, either in his official or individual hands, at the time of the said sale to him, to make or cause to be made such a transfer thereof as should have been made on the bank's books. The legal presumption that the bank, at the time of the said sale from Snyder to Collins, had notice and knowledge thereof, from time to time, during the said several years, is strengthened by the further fact that Collins collected for himself two or more of the dividends declared by said bank on said 50 shares. The presumption of law just stated, it may be contended,—and we are disposed to accede to the contention,—would not apply in this case if its history should show that Collins, at the time the said transfer was made to him individually, had an interest in himself, as an individual, at all hostile to the interest of the bank. Wade, Notice, § 662; Bank v. McNeil, 10 Bush, 54; Bank v. Cushman, 121 Mass. 490; Bank v. Irons, 8 Fed. 1, and cases cited in note. There is no intimation in the evidence that Collins had any such interest, and such an adverse interest in himself would not, under the evidence, be presumed. On the contrary, reasons suggest themselves why his interest, in order to make his said stock merchantable, etc., must have been in having the stock transferred to himself on the books when he bought it, in an honest transaction, from Snyder. Certainly, in the absence of such a transfer on the bank's books, he could not, under the by-laws of the bank, have been allowed to collect for himself all the dividends shown in the bank's books to have been declared on said shares of stock. We think, under a further line of direct evidence, which consists in a statement taken from the bank's books, to the effect that Collins, continuing to be cashier, collected for himself all the dividends which the books show were ever declared or paid by the bank to any one on said shares, the law will impute notice and knowledge to the bank of the fact that Snyder had ceased to be a stockholder in said bank long before it became insolvent, even though the bank's books now show that he, on November 19, 1885, subscribed for said 50 shares of stock in said bank. We think, too, that the law, under such a state of facts, will presume against the bank and its beneficiaries, in this suit, that Snyder ceased to be a stockholder therein when the bank, presumably with the knowledge disclosed in its own books, paid such said dividends.

from time to time to Collins for himself. So if, as a matter of fact, the name of Snyder appears still on the bank's books as a stockholder, the same books may be said to show, as a matter of law, just as conclusive, that he was not a stockholder therein when Collins, under the by-laws, collected said dividends. Either the presumption of law just stated would follow upon the direct evidence, and deductions fairly to be made therefrom, or the law would have to presume fraud gratuitously against Collins. The law on its own motion, in the pending case, should not indulge such a presumption.

At the moment when the sale by Snyder to Collins was made it appears that the said certificate was already indorsed over to Collins, presumably in keeping with the form of the certificates of the bank for such indorsements. It is true, the certificate, at the time of the sale, was in his hands as an individual, but it was also in his hands as the bank's cashier, whose official duty it was, under such a state of case, to make the transfer, or cause it to be made, upon the books of the bank. If Snyder's said several transactions, including the sale of the stock, had been had with the porter of the bank, instead of with Collins, who was the cashier, and all of the said several transactions had taken place in the bank's office, obviously the law would not have imputed notice to the bank, through the porter, of the transaction. But suppose, in a given case, A. had sold his shares of stock in a bank to B., and the sale had taken place in the bank's office, in the presence of the cashier, who at the time, to the knowledge of both A. and B., had in his hands and kept A.'s certificate, indorsed as it was over to B.; then add to that supposition the further facts that at the time of the said transaction the bank was solvent, and remained so for five years thereafter, and that the cashier is dead, and the bank, five years after said sale to B., became insolvent, and the name of A. is found in the books by the receiver thereof remaining as a stockholder of the bank's books,—would such a state of case not fairly be controlled by the rule in the Whitney v. Butler case? The receiver herein is vested only with the rights of the bank against Snyder. The law, in his interest, will not impose an absolute liability in Snyder merely because he may have been such a stockholder at one time, or because the receiver, as in this case, found his name remaining in the list of stockholders in the bank's books. If Snyder is liable at all in this suit, it is because at the time he was sued herein he should, under the facts and law applicable thereto, be held, in the interest of the insolvent bank's beneficiaries, as a shareholder in the said national banking association. An analysis of the facts in the pending case shows that Snyder in good faith became the owner of said shares in said bank, and that in such faith he certainly intended to cease his relations thereto as such stockholder; that Collins intended by his purchase of said stock to become the holder and owner of Snyder's said shares; that at the time of said sale to said Collins individually the said certificate No. 20, presumably being properly indorsed for transfer to Collins, was in and remained in the hands of the bank's cashier, with the consent and in the knowledge of the seller, purchaser, and the bank's

cashier. In law the stock ceased to belong to Snyder, and it became the property of Collins. If Snyder, after that sale, had, at a later day, sued the bank to make it pay to him the sums collected by Collins as dividends on said shares, could the bank not have successfully defended itself on the ground that Snyder, so far as the bank was concerned, had sold and transferred the said stock to Collins, who, as the owner and holder of the stock, had rightfully collected said dividends? What else could or should have been done by a prudent, careful, business man, under the state of facts in the pending case, to complete the honest efforts made by Snyder to cease to be, in fact, as well as in law, a shareholder in the said bank? In some respects the facts in this case are stronger for Snyder than for the executors of Whitney in the Whitney-Butler Case. That decision did not turn on the form of authority to make the transfer. It seems to have been the purpose of the court in that case to ground the opinion largely, if not entirely, on the broad doctrine that a shareholder in good faith, who has done all that a prudent business man should do, will not be held responsible for the neglect and carelessness of an officer of the bank. "It is of the utmost importance that the liability of stockholders of national banks should be rigorously enforced, but, on the other hand, the court should not treat them with exceptional severity, and apply to their transfers different rules from those which obtain in other business transactions." Hayes v. Shoemaker, 39 Fed. 319; Young v. McKay, 50 Fed. 394, and cases cited therein.

We think the transcript shows issues of fact which ought to have been submitted to the jury, and there was error in the court below in directing a verdict for the defendant in error; therefore the judgment of the district court is reversed, and a new trial granted.