MERCEDES FRANCES FREEMAN, ET AL., TRUST, THE CITIZENS BANK, TRUSTEE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 84016–84019. Filed July 31, 1961.

*O. J. Taylor, Esq.*, for the petitioners.
*Donald L. Sturm, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in the 1956 income tax liability of petitioners in the following amounts:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 84016 | Mercedes Frances Freeman, et al., Trust, The Citizens Bank, trustee | $2,014.71 |
| 84017 | Leila B. Freeman | 8,617.90 |
| 84018 | Leila B. Freeman, et al., Trust, The Citizens Bank, trustee | 2,014.71 |
| 84019 | Flavius B. Freeman and Frances L. Freeman, husband and wife | 5,329.88 |

The sole issue for determination is whether the petitioners are entitled to report the sale of their stock in the Springfield Baptist Hospital Association on the installment method of accounting as provided in section 453 of the 1954 Code.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

The petitioner in Docket Nos. 84016 and 84018 is a fiduciary incorporated under the laws of the State of Missouri, with the principal place of business in Springfield, Greene County, Missouri. The petitioners in Docket Nos. 84017 and 84019 are individuals residing in Springfield, Missouri. The individuals in Docket No. 84019 are husband and wife. The returns in each of the cases for the period here involved were filed with the district director of internal revenue at Kansas City, Missouri.

The Springfield Baptist Hospital Association (hereinafter referred to as the association) was a corporation organized under the laws of the State of Missouri, in 1904, as a business corporation. Stock in the corporation was owned largely by doctors, widows of doctors, Baptist laymen, and Baptist churches.

---

[1] Proceedings of the following petitioners are consolidated herewith: Leila B. Freeman, Docket No. 84017; Leila B. Freeman, et al, Trust, The Citizens Bank, Trustee, Docket No. 84018; and Flavius B. Freeman and Frances L. Freeman, husband and wife, Docket No. 84019.

Samuel F. Freeman (hereinafter referred to as Samuel) was president of the board of directors of the association from 1923 until his death in 1950. Flavius B. Freeman (hereinafter referred to as Freeman) is the son of Samuel and, upon the death of his father, succeeded to the position of president of the hospital board. Leila B. Freeman, petitioner in Docket No. 84017, is the widow of Samuel and the mother of Freeman. The trusts which are involved in Docket Nos. 84016 and 84018 are trusts which were established for the benefit of the widow and grandchildren of Samuel.

For some years, both prior and subsequent to the death of Samuel, consideration was given by the stockholders and directors of the association to a means by which the hospital might be turned over to a nonprofit institution or organization so that its operation might thereafter be continued by such organization. No definite action was taken, however, until December 1955.

On December 11, 1955, the association received a night letter from the president of the Ford Foundation informing the association that a tentative grant in the amount of $53,600 was being considered for the association since the Ford Foundation believed the association to be a voluntary, nonprofit hospital. On December 15, 1955, the Ford Foundation, through its president, H. Rowan Gaither, Jr., wrote to the executive officer of the association setting forth in detail the purpose of the grant, the qualifications of the grantee, and how the amount of the grant was computed. The letter stated that the grant-in-aid program was undertaken to assist voluntary, nonprofit hospitals in the United States, its territories, and possessions. The association was to submit an application setting forth various information so as to enable the Ford Foundation to determine whether the association satisfied the terms and conditions of the grant.

On December 27, 1955, the board of directors of the association held a special meeting, wherein it was resolved that the association be converted into a nonprofit institution. It was also resolved that the resolution of the board of directors be submitted to a special meeting of the shareholders to be held on January 10, 1956.

On December 28, 1955, Freeman, representing the association, sent a letter to Del E. Caywood, who represented the nonprofit institution group, stating that it was agreeable to the board of directors of the association that the real and personal property and other tangible assets be purchased by the nonprofit group for the purchase price of $231,200. The nonprofit group was not required to make any downpayment, but instead executed a note for the purchase price with interest at the rate of 4 percent per annum. The note was to be payable over a period of 10 years. This letter was confirmed and became the contract of sale.

The laws of the State of Missouri offered two courses of action which would accomplish the same objective or result, that is, the conversion of the business corporation which had theretofore operated the hospital into a nonprofit corporation which would thereafter operate the hospital. Under one method permitted by the Missouri law, the stockholders would have surrendered to the corporation all of their shares of stock and the articles of incorporation would have been amended to eliminate any provisions which were in conflict with the requirements of the Missouri Not For Profit Corporation Act. Upon satisfactory compliance with the requirements, the corporation would have become a not-for-profit corporation. The second method authorized under Missouri law required the formation of a new not-for-profit corporation to take over the assets and operation of the association and the subsequent dissolution of the association.

On January 1, 1956, Freeman, acting as president for the association, sent a letter to the Tax Rulings Division, Office of the Commissioner of Internal Revenue, requesting a revenue ruling on the proposed conversion of the association into a nonprofit corporation by a redemption of stock from the shareholders of the association. The stockholders of the association wanted to find out if the gain on the redemption of their stock would be taxed as capital gain and whether they could report the sale on the installment method of accounting as provided in section 453 of the 1954 Code.

On January 10, 1956, a special meeting of the shareholders of the association was held. The shareholders discussed the fact that the unanimous approval of all shareholders was necessary before a private corporation could be converted into a nonprofit organization under The General Not For Profit Corporation Act of the State of Missouri. Since the unanimous approval of all the shareholders could not then be obtained, a plan of complete liquidation of the association was discussed, wherein only 75 percent of the shareholders needed to approve. A shareholders meeting was to be held on January 24, 1956, for the purpose of considering the alternate plan of dissolving the association.

In answer to the association's request for a ruling, on January 19, 1956, the Director of the Tax Rulings Division, Internal Revenue Service, wrote to the association stating that if the proposed redemption by the association of the stock of its shareholders took place and the redemption was in complete termination of each shareholder's interest in the stock of the corporation within the meaning of section 302(b)(3) of the Internal Revenue Code of 1954, the distribution by the corporation in full payment would be treated as a sale or exchange under section 302(a) of the 1954 Code. The ruling stated further that if the stockholders held the stock for investment purposes, gain

or loss on the redemption would constitute capital gain or loss. The ruling contemplated a distribution made solely by the corporation of cash and a mortgage note of the association. The ruling stated:

The Corporation will issue pro rata to its stockholders in full payment in exchange for their stock approximately $92,500 out of its cash and investments, and will issue a mortgage note in the amount of $227,500 payable $22,750 annually with interest at 4%.

The ruling went further to hold that:

If the payments received by each stockholder for his stock in the taxable year of the exchange do not exceed 30 percent of the selling price, and the selling price exceeds $1,000, such transaction will qualify as a casual sale of personal property within the meaning of section 453(b) of the 1954 Code. If the election to report the transaction on the installment basis is made in a timely filed return, each stockholder may return as income in any taxable year that portion of such installment payments received in that year in reduction of the principal indebtedness which the gross profit to be realized when payment is completed bears to the total contract price.

On January 24, 1956, a special meeting of the shareholders of the association was held, wherein a plan of complete liquidation of the association was discussed. With at least 75 percent of the shareholders agreeing to the liquidation of the association, it was resolved that the association be liquidated under the General and Business Corporation Act of Missouri; that all liabilities of the association be paid and that all remaining assets be distributed in cash or in kind among the stockholders according to their respective rights and interests; and that the articles of dissolution be executed so as to properly wind up the affairs of the association. The complete liquidation was decided upon in lieu of the redemption of all the stock of the association. The requested tax ruling, dated January 1, 1956, was applicable only in the case of a redemption.

On January 27, 1956, at a meeting of the board of directors of the Springfield Baptist Hospital (sometimes hereinafter referred to as the hospital), a nonprofit corporation, a resolution was adopted authorizing the secretary of the hospital or other proper officer to execute on behalf of the hospital a note in the principal amount of $231,200, bearing interest at the rate of 4 percent from February 1, 1956, payable over 10 annual installments of $23,100 each, beginning on February 1, 1957. The payees of the note were to be the Citizens Bank of Springfield, Missouri, Gladys S. Mayden and Flavius B. Freeman, as trustees. The note was to be secured by a deed of trust and chattel mortgage upon the real and personal property conveyed by the association to the hospital.

On January 27, 1956, a declaration of trust was executed by the Citizens Bank of Springfield, Missouri, Gladys S. Mayden and Flavius

B. Freeman, as trustees for the shareholders of the association. The trust was entitled "The Springfield Baptist Hospital Association Trust" (hereinafter referred to as the trust). The rest of the trust was to consist of a certain note to be executed by the Springfield Baptist Hospital in the amount of $231,200 bearing interest at the rate of 4 percent per annum. The purpose and intent of the trust was stated as follows:

This trust is created in connection with and as provided for in a certain "Plan for Complete Liquidation of Springfield Baptist Hospital Association" adopted by the shareholders thereof on January 24, 1956; and its purpose and intent is to hold title to the note and security therefor hereinbefore mentioned, as well as any other assets which are owned by said shareholders as a result of the dissolution of said corporation but which cannot be actually collected and distributed to the shareholders within a period of twelve months from the date of the adoption of the plan of complete liquidation, and this trust is set up so that complete distribution of all assets shall and can be made within the twelve month period as provided for in said plan for complete liquidation.

The beneficiaries of the trust were the shareholders of the association. Each shareholder was given a certificate of participation in the trust equivalent to the number of shares of stock held in the association.

On February 1, 1956, a deed of trust and chattel mortgage was entered into between the hospital, first party, Harry G. Neale, second party, and the Citizens Bank of Springfield, Missouri, Gladys S. Mayden and Flavius B. Freeman, trustees, as third parties. The first party transferred certain of the property received from the association to the second party, in trust for the third party, for the consideration of $1. The indenture was to last until the promissory note of the hospital in the amount of $231,200 was paid. In the event that default be made of any payment due under the promissory note, the third party could demand full payment of the promissory note at such time.

The promissory note, dated February 1, 1956, was executed by the hospital, as payor, to the trustees of the trust, as payees, in the principal amount of $231,200 with interest at the rate of 4 percent per annum. The trust took possession of the note, holding same for the benefit of the shareholders of the association.

On March 12, 1956, the Ford Foundation notified the hospital that it was not entitled to the $53,600 grant since it was not a nonprofit charitable institution and did not enjoy tax exemption on December 12, 1955, the date of the announcement of the grant. The letter stated:

In order to be considered for a grant under this program, the organization must be an operating voluntary (nongovernmental) hospital accepted for listing as a non-profit hospital by the American Hospital Association in its 1955 Administrators Guide, or have an application for such listing on file with the

Association by December 12, 1955 and accepted by the Association on or before March 15, 1956.

\* \* \* \* \* \* \*

It appears from your letter that as of the date of our announcement of the program, the Springfield Baptist Hospital was not organized as a nonprofit charitable institution and did not enjoy tax exemption. If this is the case, I regret to advise you that it will not be possible to consider the request of the hospital.

On October 30, 1956, Freeman, as president of the association, sent to the Tax Rulings Division, Office of the Commissioner of Internal Revenue, an application for ruling or closing agreement. Among other things, it was stated in the application that the association sold its real and personal property, including $28,800 in Government bonds, to the hospital; and that the hospital paid $231,200 for all of these assets evidenced by a promissory note. The association then completely liquidated, distributing $69,375 to its shareholders on March 24, 1956, and $23,125 on or about November 1, 1956, making a total distribution in 1956 of $92,500 or the par value of the outstanding stock.

On January 23, 1957, the Director of the Tax Rulings Division, Office of the Commissioner of Internal Revenue, wrote to the association and stated that since the corporation was in complete liquidation and the distribution to its shareholders was in cash and evidence of indebtedness of a person other than the purchaser, the shareholders received more than 30 percent of the selling price of its stock in the taxable year of the sale and, therefore, the provisions of section 453 of the Internal Revenue Code of 1954 were not applicable and the shareholders were not entitled to report their gain on the installment method. The ruling stated:

The distribution by the Corporation to its stockholders of the note receivable from the Springfield Baptist Hospital, which note is secured by a deed of trust upon the real and personal property which was sold to the Hospital, will constitute a payment in property other than an evidence of indebtedness of the purchaser during the taxable year in which the exchange of the stock pursuant to the plan of liquidation was made, and will constitute part of the "initial payments" to be received by the stockholders, from which it follows that installment classification must be denied.

In accordance with the duly adopted plan of liquidation of the association, the following distributions were made during 1956:

Cash distributed to shareholders in 1956 at $250 per share_____ $92, 500
Note of the hospital distributed to the Citizens Bank as liquidating
 trustee, each of the shareholders receiving a certificate for his pro
 rata share of the avails and proceeds of the liquidating trust when
 and as collected_____ 231, 200
Total eventual distribution to all shareholders_____ 339, 400

On their Federal income tax return, the petitioners reported the gain on the sale of their stock in 1956 as follows:

| Docket No. | Number of shares of association stock | Initial payments in cash in 1956 | Total selling price | Total gain | Gain reported in 1956 |
|---|---|---|---|---|---|
| 84016 | 32 | $8,000 | $27,995.52 | $19,995.52 | $5,713.92 |
| 84017 | 63 | 15,750 | 55,116.18 | 45,109.93 | 12,890.59 |
| 84018 | 32 | 8,000 | 27,995.52 | 19,995.52 | 5,713.92 |
| 84019 | 42 | 10,500 | 36,744.12 | 29,569.12 | 8,449.64 |

OPINION.

The issue to be determined is whether the petitioners are entitled to report the sale of their stock in the association on the installment method of accounting as provided in section 453 of the 1954 Code.[2]

The petitioners contend that there were two ways in which they could have converted the association into a nonprofit organization. The association could have redeemed all of the stock or it could sell the assets to a nonprofit organization, as it did, and then liquidate. Petitioners contend that there is no essential difference between the two transactions. Under either proposal the not-for-profit corporation would own the same assets, the hospital would be operated by a not-for-profit corporation, the stockholders would receive $92,500 cash in 1956 and a 10-year note for $231,200, and under either proposal the note was to be issued by the not-for-profit corporation.

We are unable to agree with petitioners' contention. Quite often, two transactions will produce the same ultimate results but different tax consequences follow from each. Cf. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), and *United States* v. *Cumberland Publ. Serv. Co.*, 338 U.S. 451 (1950). The real question involved in this

[2] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after [August 16, 1954] the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

case is not whether the two transactions produce the same economic results to the stockholders, but whether petitioners received more than 30 percent of the selling price of their stock in 1956. The answer to this question is determined by whether what petitioners received for their stock, other than cash, was an "evidence of indebtedness of the purchaser" as required by section 453 (b) (2) (A) (ii).

Section 331(a) (1) of the 1954 Code provides that amounts distributed in complete liquidation of a corporation shall be treated as full payment in exchange for the stock. In the case before us, *the association* was the liquidating corporation; therefore, it was the purchaser. The association distributed the note of *the hospital* to the trust and the petitioners (as stockholders of the association) were given trust certificates in proportion to their stockholdings. The "evidence of indebtedness" received by petitioners was not that of the purchaser as required by section 453 (b) (2) (A) (ii), but that of the hospital, a third party. Since the note was not an "evidence of indebtedness of the purchaser," it must be considered part of the payment made in 1956; hence, the payments in 1956 exceed 30 percent of the selling price. See *Caldwell* v. *United States*, 114 F. 2d 995 (C.A. 3, 1940); *Georgia-Florida Land Co.*, 16 B.T.A. 1253 (1929); *J. W. Elmore*, 15 B.T.A. 1210 (1929). Accordingly, the provisions of section 453 have not been met and the respondent's determination is sustained.

*Decisions will be entered for the respondent.*